What do you call the first case? Can the people who are going to argue this case please come up and approach the podium and give us your names? Good afternoon. Austin Monroe on behalf of the appellee. As you both know, you have 20 minutes aside. Mr. Ford, would you like to save any time for rebuttal? I'll save about five minutes. Please keep your voices up nice and loud. This does not amplify. It only records. Mr. Ford, whenever you are ready. If you need some water, take some. I apologize for problems with my voice. The good news is it's a sign of spring. I'm pleased to call Mr. Monroe. The court has two issues to decide. Whether there was a good faith settlement and whether the attorney-client privilege communications between whether there was an attorney-client privilege. And just briefly and to clarify, the privilege question remains separate and apart from the good faith settlement. That's going to be an issue at trial no matter what. Yes. The plaintiff in the underlying action, Mr. Ross, is not a party to this appeal. He was injured in the railroad yard. He suffered a compression fracture to T12. Nothing in this case affects his rights against the railroad. This appeal only concerns the other essential rights to recover a portion of any adverse judgment that may be entered against them. Against that they can recover then against Dr. Elias. And then again, just to clarify, whatever we decide in this case, Mr. Ross has given up any rights against Dr. Elias. Correct? That quote or not? No, if you reverse and say there wasn't a good faith settlement. Well, there could be a settlement and not a good faith settlement, could there not? I mean, that's a genuine question. If you don't know that. It's never occurred to me. Okay. Well, yeah, we think he'll be back in the case for all purposes. Although Mr. Ross has not sued him. And that's one of the things that we discuss a little bit here. But the bottom line is the plaintiff has a very substantial case against LA Central. And we believe LA Central has a very substantial case in our practice case to recover most or a good deal of those damages against Dr. Elias. I know you've read our briefs and we talk about at great length about the extent of the treatments that he received. He had 18 different medical treatments. The plaintiff's own expert testified that 17 of 18 were unnecessary. Of course, that report was not available at the time of the settlement, correct? It was available. Well, he hadn't testified at that time. He was retained before that. They knew what he was going to say. Well, yes, that's what you say. But is there anything in the record that shows that they knew what he was going to say before the settlement was reached? Other than that you suspect they did because of when he was retained. Yeah, he had been retained before that. It's in the record as to what he testified after the settlement. I know you. I understand. I'm just wondering if there's anything in the record that demonstrates that they had actual knowledge of what he was going to say at the time of the settlement. Not that I know of, John. Our consulting doctor also, of course, that 17 of the 18 were unnecessary, said he could have been back in his old job in three months. His own expert said a year. Dr. Elias was treating him for three years. Dr. Elias told the Railroad Retirement Board that he was permanently disabled, although his own records show that he had a pretty good recovery and he was kind of boastful about the recovery. All of this, and I know we've discussed this at length with a little like redundancy probably in our briefs. But the point is to show you that there was a very good malpractice case here. That's all you have to understand. There was a very good malpractice case here. And the LMI Central is entitled to recover a lot of judgment that most of this man's damages are a result of not of conduct by the LMI Central when he fell in the yard, but of the conduct of the Dr. Elias. I know you're familiar with the cases. On what is a good faith settlement, what does it take? I want to point out a couple of things that we stress, that you have the same record as the trial court. And we firmly believe she abused her discretion in approving this settlement. But Dr. Elias paid $25,000. That was basically his self-retention under his insurance policy. The risk here that he had is in the millions of dollars. When you say the courts encourage settlement. Do you think this will help settle the rest of the case? No. I think it actually prevents it. Because he kept the liens, it makes it impossible, frankly, to settle the rest of the case. Because the starting point is several hundred and some thousand dollars. So it's not going to help settle the case. What is the significance, in your view, of the reduction of the liens vis-a-vis whether it's a good faith settlement? Does that have any role? No. No. If anything, it's fraudulent. But to be legitimately considered, the reduction of the liens, trying to. . . Should have been credited to you. Should have been credited to him so we get the set off of that. Right. If that was part of the consideration, then it should be part of the set off. But you're not suggesting that that in itself demonstrates it wasn't a good faith settlement, the fact that the liens were. . . It makes it suspicious, which is really another reason why we have to see the documents. But it does make it suspicious. But insofar as a straightforward look at the good faith settlement, it doesn't help at all if it doesn't contribute to the set off. And there is a case that I can't call up right now that gets right to that point. But besides the risk of a large judgment, the strong evidence against Dr. Elias, the fact that he maintains those liens and he is in fact a creditor in the case is an indication that this is not a good faith settlement. You won't find a case where a set law stays in the case as a creditor. The only thing remotely close to it is a loan agreement in the bad case, which we discuss in our briefs. And the courts set that aside because they said that you can't retain a loan. You can't loan and keep a loan interest in a settlement. Furthermore, the deal was made in secret. Illinois was not advised of the negotiations. It was not part of the negotiations. Is there any requirement that you be made part of the negotiations? It's a fact that the courts have said that's significant. And when you're evaluating the good faith of a settlement. Weren't there liens still in place in Cleveringa? You're familiar with that case, Cleveringa versus J.J. Case? I'm familiar with it, yes. And liens remained. Would the settling parties still have liens against the non-settling party in that case? That's a different situation. And I don't think there's any case where the parties can retain those liens and say we'll pay you $300,000. But we want $400,000 back out of your recovery. That's bad. And Bob said, no, you don't. Because what you're doing is you're shifting liability to the other defendant. And that is a violation in itself of the Contribution Act. Another factor that the court considers is the question of was there collusion between the defendants, between the settling parties, the plaintiff and the defendant. And here the most shocking part of this case is they openly admit that the whole purpose of this agreement was so they could gang up on Illinois Central, maximize the damages of Illinois Central. And with the doctor in the case, Dr. Elias was at risk of a big judgment coming against him. So he wanted to make sure that Elias could get a big judgment so that he could get his liens paid. That's what he says. He said, we joined together. This is their so-called common interest. We joined together to maximize the recovery against Illinois Central. Now, that is an illicit use of the Contribution Act under any circumstances. Now, I think in your opening brief you say that there was a very close personal relationship between the patient and the doctor. Yes. And they say that there's no evidence in the record as to that. What would you base that on? There's two things that I would point to. These last statements are relevant to that. The plaintiff's expert, Dr. Gates, said in his opinion, the patient, his client, his patient, was under the influence, mental, emotional influence of Dr. Elias. Even more impressive, while Dr. Elias' records say boastfully what a great recovery Ross is having, he files documents with him, for him, with the Railroad Retirement Board saying he's permanently disabled. That shows a collaboration here that indicates a very close relationship, and that of a good kind. I think that all the factors that you see in the cases and what you see here show that the evidence overwhelmingly shows that there was no good faith settlement here, and the circuit court views are discretionary. Do you agree, I assume, that it's your burden to show a view of discretion, and it was your burden below to show that it's not a good faith settlement? Yes. Well, we had a prima facie, and then we had the remnants of the evidence, which I think was easily handled for the reasons I state. The second issue that you have to deal with is the question of whether there was a common interest, and therefore the relationship between Dr. Elias and Ross was so close and their interests so connected that they could share the attorney-client privilege. We believe that this is a real stretch, an attempted stretch of the common interest doctrine. It's a stretch of the attorney-client privilege. I think all of these issues you start, and the Illinois judge starts from the proposition that under Illinois law, this privilege or all privileges are very strictly confined, and the language of waste management is strictly confined within the narrowest possible limits. The labor law is in the Selby case. I know you're very familiar with that case. I pointed out some aspects of Selby that are relevant here. In Selby, there was a written agreement. Yes, there was no evidence. There was no evidence of any agreement. And here they were supposed to be negotiating at arm's length. You can't be negotiating at arm's length and have a common interest. Negotiating at arm's length is the antithesis of a common interest. Another point, the claim of interest, common interest here, was illicit. And the law would never condemn the claim that's a legitimate common interest when the sole purpose that they got together was to contrary to the Contribution Act to maximize the damages against the Illinois Central. Also, a law is put good faith at issue here. And if good faith is an issue, they have to share the underlying information, and that's a Western State personal error case. Also, the communications here occurred before there was an agreement. Can I come back to this illegitimate common interest? First of all, did you cite any case that suggests maximizing recovery against a defendant is an illegitimate interest? And did you cite any case that said we should even consider whether the common interest is a legitimate one? Do you cite any case that said either of those? I think there was a point made over and over in the brief. We did not cite a case that this situation was an illicit combination. No, we did not. I think the rest of it, though, is clear in that we suggested. I mean, criminal co-defendants can certainly have a common interest. There are all sorts of. Oh, but there's nothing wrong with that. Okay. Well, I'm not sure there's anything wrong with trying to maximize recovery against the railroad, per se. Well, I wish there is, because the Contribution Act says you can't use it to shift liability. I understand the Contribution Act. It may undermine a good faith fair. I'm just saying it's not legitimate. No, that's not what I'm talking about. Okay. I'm talking about under the Contribution Act. It's contrary to the policy of Illinois. The other point that I want to make it so far as the common interest issue is concerned is. I don't think Selway suggests that you can have a common interest on any individual issue in a case. You can't have a situation. And there's a few words in there that suggest something like that. But it couldn't be that. Judge Ellis couldn't have meant that. In other words, you couldn't have a defendant could not say, I agree with the plaintiff on this part of the contract, but we're fighting it on the other four points. Or we agree with the plaintiff on venue. So on subjects like that, we can share attorney-client information. If you're going to recognize a common interest, and now we are. It is like he cites the McPartland case at one point. A criminal case is a perfect example where two or three defendants in a criminal case agree that through four or five witnesses, or maybe for the whole case, they can share attorney-client materials. But you can't pick and choose little issues here and there throughout the case and say on this issue, we're going to have a common interest and therefore we can share privileged information without waiving the privilege. I think that covers the points I wanted to cover. One point they make is the issue of the documents that they exchanged are not part of the record. Is there an attorney-client relationship? Otherwise, for the reasons I've tried to express, there was an abuse of discretion and there was no common interest privilege here. All right. I have one question. The relief that you're seeking, is it to find that the finding of a good faith settlement is reversed? Or are you asking that it be remanded for further hearing subject to whether you obtain the documents that they claim privilege? I think there are three steps. On your argument of reverse, it says a matter of law based on this evidence, and you're looking at the same evidence that Judge Johnson was, that as a matter of law there was no good faith settlement here amended. A second possibility is that you send it back and say you've got to consider some of these other issues. All of the money that he had available, part of the fact that his, of the leaves that he retains. And so, therefore, if you consider those, then considering those, you may reconsider and find it was not a good faith settlement. The third possibility is that you say that, take a look at the documents. So far, it's okay, but you've got to show the, in a way, central the documents. And then after that, reconsider. But I really think that on the evidence here, there was no good faith settlement. Thank you. Thank you. Did I save a couple minutes? Yeah. We'll give it to you. Counsel. May it please the court. Counsel. Good afternoon again. My name is Austin Monroe, and I represent the third-party defendant and appellee, Dr. Elias. You've heard argument that Illinois Central Railroad believes they have a strong medical malpractice case against Dr. Elias. It's simply not so. What we have is a plaintiff who was happy with the treatment he received, made an exceptional recovery given the injuries he sustained, and chose not to sue the doctor. What we also have is a plaintiff who has not criticized any of the care he received. We have a doctor who has testified and sworn under oath that he complied with the standard of care and all of his treatment was both reasonable and necessary. We also have the depositions of every F-2 witness deposed who testified that the treatment received was reasonable and necessary, and this patient improved as a result of that care. Who are you referring to? So the patient was treated by Dr. Elias, as well as chiropractors who provided physical therapy, Dr. Melissa Nipper, and... Who all worked for Dr. Elias, correct? Worked for a facility of which Dr. Elias owned, correct. The testimony to the contrary prior to the settlement, there was none. There was written letters by an expert retained by the railroad, Dr. Zellwey. He wrote letters after being hired by the railroad to look into the case. At the time of settlement, that's all there was. But Dr. Gates, you're not saying he totally supported Dr. Elias' position? Dr. Gates, first as a holistic orthopedic physician, testified that much of the treatment wasn't necessary, but also testified that none of the treatment caused any injury. That disclosure came after the settlement, so while he wasn't supportive of all of the treatment, Now, he's a holistic physician. He wasn't supportive of all the treatment. That came after the settlement, and he said there was no harm that came of it because of looking at the recovery in which the plaintiff made. Well, the reality is that you have a plaintiff who's claiming injury, seeking compensation from his employer, the railroad. And his compensation that he is seeking includes consideration of the extent of the medical bills, correct? Correct, the reasonable and necessary medical bills. Right. So whether he received good treatment or bad treatment, the jury, the fact finder, is going to have to decide whether those $3 million or $1.7 million or whatever it was in claimed expenses were reasonable, right? That's correct. Right. So you could receive good medical treatment but have exorbitant medical bills, right? That's a possibility. Right. So why wouldn't a judge consider in a good faith settlement whether it is reasonable to allow the third party defendant to avoid any fact finder finding that they have to contribute more than $25,000 to this claimed damages? Right. I mean, that seems to me to be the issue. Rather, why Dr. Walsh? You claim that your client, the doctor and the plaintiff, have a common interest. The way I look at it from high above is that they don't have a common interest. The plaintiff's interest is to get compensation for his injury, which includes reasonable medical expenses. Correct. He doesn't care where it comes from. He doesn't care whether it comes from the railroad or from the third party defendant. So they don't have a common interest. They do have a common interest once they reach the settlement, because now the only thing that the plaintiff can recover, the only entity that they can recover from is the remaining railroad. So, yes, the interest at that point for him is to get as much as he can from the railroad. The doctor really has nothing to do with it other than to say that, no, these bills were properly incurred. So the reasonableness and necessity of medical treatment, obviously that's in the interest of Dr. Elias, because that's one of the allegations that's against him, that he provided treatment that was neither reasonable nor necessary. Illinois pattern jury instruction 30.06 creates an element of damages. If the plaintiff is able to establish that the medical treatment was both reasonable and necessary. So the common interest in proving that point is a common interest between the plaintiff, who needs to prove that in order to recover, and Dr. Elias, who needs to prove that in order to defend against the allegations of malpractice. I'll accept that, but there's also the other element of the railroad injecting into the case now, that the injury that necessitated these bills, if they were reasonable, was not an injury caused by the railroad. It was caused by the third-party defendant. So, again, I don't get the common interest. So the common interest of proving the necessity and reasonableness of the bills? The common interest prior to the settlement with Dr. Elias. Right. I don't see a common interest between the plaintiff and Dr. Elias. So the stage we were at in the case was within discovery. So where both sides would be gathering evidence to either use or not use at trial, the plaintiff was gathering evidence regarding the reasonableness and necessity of the medical bills to satisfy jury instruction 30.06, and Dr. Elias was gathering evidence to defeat the claims against him for medical malpractice. Now, regarding the injuries, there was no sworn testimony that Dr. Elias' treatment was not reasonable and necessary at the time of settlement. Granted, Dr. Gates and Dr. Zelby came into the picture afterwards, but at the time Dr. Elias first saw the patient, he was very injured. He had crushed vertebrae, he had ligamentous injuries, and he had disc herniations that all needed treatment. The plaintiff testified that he experienced relief and felt better after every single one of those treatments. There is no testimony to suggest that Dr. Elias caused any injury to Mr. Ross, and it's all quite the opposite. The only testimony that contradicts that is that of the hired expert for the railroad, Dr. Zelby, and even Dr. Gates said there was no injury that came of it. So we only consider Dr. Elias' favorable testimony and don't consider the opposing parties' unfavorable testimony? At this time, there was no sworn testimony from Dr. Zelby at all. At the time the good faith finding was granted, Dr. Zelby had only been disclosed in a 213F3 disclosure. He had not yet been deposed and put under oath and questioned regarding his- At the time of the settlement or at the time of the good faith finding? At the time of the good faith finding, Dr. Zelby had not yet been deposed. Did you have his report? We had his report that was unsworn. So we're obviously aware of his opinions, but they're not sworn. Dr. Elias' are. Dr. Howell and Dr. Hopkins are. Dr. Gates had been deposed though, correct? Dr. Gates had been deposed after the settlement- But before the good faith finding? Correct. And he did give some testimony, didn't he? And if I'm misreading this, tell me. But, you know, when he's asked about- He says something about the adverse effect of multiple invasive procedures done on the spine, that he had said that in his report. And then he says, well, the real answer is I don't know. If we talk to the patient, okay, I got eight things that the patient relates, and then he goes, oh, eight things. So could all those things have been caused by multiple procedures? I don't know. It's sure possible. That's what he said, correct? Yes, and he's not a surgeon, as Dr. Elias says. So there would be the issue of trial, whether or not opinions from him in that regard are even admissible. He's a holistic orthopedic physician. Okay, okay. But there is some evidence that these procedures- I understand that Dr. Elias hasn't even attended his own expert yet. Correct. But there is some evidence that these procedures caused the injury. Right. There's some evidence from retained, controlled experts. And from the plaintiff's expert. And from the plaintiff's expert, whose qualifications are questionable. Okay. But that brings us to the Antoine Shelley case that was decided by Judge Johnson and affirmed by the Supreme Court. The Court does not need to do fact-finding to determine the exact liability of the parties in order to- Correct. And when a valid settlement agreement is presented, the burden of proving the lack of good faith is shifted to them by a preponderance of the evidence. So I understand there's conflicting testimony, and as I said, some of it isn't sworn testimony. I think that falls far below the preponderance of the evidence. So then what's on your side? How do you justify the $25,000? What's the evidence that justifies the $25,000? So the evidence that would justify the $25,000 is we have a happy patient. He has no complaints of any of the care he received. Dr. Elias obviously has a bias in saying that he provided necessary and reasonable care, but he's sworn to that under oath. All of the treaters said that the treatment they provided was reasonable and necessary. Dr. Howell Knicker, the chiropractor who provided treatment, said that this is the worst case I have ever seen, and that's why I remember this. And the chance of recovery is being overblown by the railroad. The railroad now has a motion for partial summary judgment. They have five experts who support their case, including Dr. Zellwey. There's five. So it would be four that support their case against the plaintiff. Also, Dr. Gates, in his deposition, said this.  I'm sorry? You say the railroad has five experts that support their case against the plaintiff. As to what issue? The reasonableness of the care and the amount of the billing? One of them, Dr. Zellwey, would be that for the medical side, the third party action for the underlying action against the plaintiff. Against the railroad. If I recall correctly, railroad experts, I think a vocational rehabilitation expert, possibly an economist, it's been a while since I've looked at that, but they all deal with the underlying cause. So you're saying there's a good chance Mr. Ross could lose completely, and that's part of what makes this $25,000 legitimate? Yes, and that's what Cleverula talks about, is as of right now, the result of this case is uncertain, and the settlement, you settle for a fixed result at the expense of not knowing at trial if you could have came out paying zero. When you refuse to settle, you then gamble that you may get zero, you may be found for more. Now, did the fact that Dr. Elias had a $3 million liability policy that was untouched, does that enter into our consideration at all? So I think the brief misstates the policy. I believe it was $1 million. I don't know if that makes a difference. There's been no case law provided that the availability of funds in proportion to the settlement made has any relevance that because you have a larger insurance policy, you must settle for more. This was negotiated with the plaintiff through his counsel and agreed upon. Does the retention of liens factor into the consideration? It shouldn't. It should not? No, because all of the cases cited are workers' complaints. They're compensation, a judicial process to compensate this person for their injuries through the workers' compensation avenue. In this instance, these were services provided. These were actual visits and procedures performed by Dr. Elias at his businesses where he took on the time and the expense of staffing and supplying these facilities. It's a lien that exists whether this lawsuit exists or not. Whether Mr. Ross recovers any money, it's a lien that exists. So it shouldn't be taken into consideration. It had nothing to do with this settlement. If you read the language of the settlement agreement, there's no discussion about the lien, so the claim that it should be included as a sell-off should be disregarded. It was not negotiated as part of the agreement. What is this reduction of lien? How is that figured out? The reduction of the lien. Are you talking about the bills, the reduction of the bill? Yes. So Dr. Elias answered written discovery and produced the bills in the form they were at that time. At his deposition, he was asked, is this $1.25 million bill accurate? And he said, no, it's not. He said it has to be audited. It's not finalized. And he said the actual amount will be much less. This was well before any settlement negotiations. And he testified that essentially what they're talking about is a reduction because they were given a draft. They were not given the final copy of the bills. It was three years after the last treatment, wasn't it? It was. I can't explain the timing of it. Other than at the time they were requested, they weren't finalized. Once he testified at his deposition that they need to be finalized, following that, the first request we received for finalized bills was received from the plaintiff, and he was promptly given or a doctor worked on it. I don't know what process he went through to audit them, but he produced finalized bills upon the first follow-up of his deposition testimony. Let's see here. Inmate Babs was discussed at length talking about loan receipt and the net consideration of the settlement. The case says that you can't indirectly get contribution from a non-settling party, and this goes, I think, to your question. This isn't contribution. They're not seeking repayment of money that Dr. Elias has paid out as a result of this injury. What he's seeking is recoupment for services that he provided or the businesses provided, the three businesses that he owns and runs. So I think that's an important distinction. Regarding the good faith finding, there's been no evidence that the circuit court did not consider everything that is being presented here today. The circuit court allowed every opportunity for the railroad to investigate and gather information. They were given leave to issue written discovery to the parties, which was answered. Except the part that wasn't answered. Well, that part was answered. They then issued subpoenas to the law firms who were involved, and we brought a motion to quash. The judge denied that and said, no, you're going to produce everything to the court for an in-camera inspection, as discussed in Sully, saying that the court should look at the communications in camera and see the substance of the communications and evaluate whether or not there's a true common interest that's being expressed in those. That's something the circuit court had the benefit of, and as we point out, it's not within the record what those communications were. But why does that matter if their argument is there is no common interest, period? You do not meet the criteria for a common interest exception to waiver of the attorney-client privilege once you share these documents. I'm sorry. I would have to look at the documents to respond to their contention. Their contention doesn't have anything to do with what's in the documents. Right. Their contention is that in the abstract, there is no way that this common interest could exist. Right. And I think that is in contradiction with Sully. But we don't need to see the documents to resolve that issue. I think it would better inform the court as to the common interest. Why? They either have it or they don't. There's nothing to do with what's in the documents. Okay. I think it would better illustrate the common interest that's being shared between the parties. And I wanted to make sure that I made it very clear. At no point in any of our briefs, either here or in the circuit court, did we ever say that the common interest was to maximize the recovery of the plaintiff. It has always been to establish and maximize the liability of the railroad. Obviously, we would not want to maximize recovery in the event that this goes to trial and there's apportionment because then that would increase our liability. What we want is to gather evidence in discovery, not to certainly be used at trial, but if the occasion arose that it looks like the jury may have to apportion damages, we need to be equipped with that information. We need to have evidence to establish the liability, or I'm sorry, to maximize the liability of the railroad. Okay. And the plaintiff obviously would want to do the same as a prima facie case against the railroad. Why would he want to establish it against both of them? Well, he's happy with the treatment that he received from Dr. Elias. He has no reason to believe that such a case exists, and that's our argument that no such case exists. But if the plaintiff is in the case saying, I got injured and I have these damages, he's there to get maximum recovery, right? Correct. If the railroad's in the case, they don't want to pay anything, and if you're in the case, you don't want to pay anything. Correct. But he doesn't care who pays him, whether it's you or the railroad. Correct. Right? I would think. I would, too. Yeah. So he has no common interest with you to that extent. You want to pay nothing. He wants everything, from any point. Right. And while he may not care who he recovers from, a common interest doesn't mean it's a sole interest. He has a common interest in establishing and maximizing, really establishing the liability against the railroad. And he may also have an interest in establishing the liability against us if he doesn't care where the money comes from. But just because he has numerous interests in the case doesn't mean we can't share that interest, that in collecting evidence to establish and maximize the liability of the railroad. Well, as long as I'm speaking and occupying everybody's time, on the issue of common interest, do you agree that that analysis requires that there be some sort of agreement between no agreements necessary? Well, Selby, there's been no case presented that says that you must have an agreement in order to use the common interest exception of the attorney-client privilege. What Selby does say is because there is an agreement in this case, we'll have no occasion to make that determination whether or not one was required. I would argue that the formality of an agreement isn't necessary. Selby says the heart of it is the interest itself, and that establishes the exception. And the exception is limited solely to communications regarding that interest. So Selby does not say that there has to be a written agreement. It's specifically said- I'm talking about any agreement. Did you have an oral agreement? There was no oral agreement. I know you say there was no oral agreement, but do you need an oral agreement, some sort of agreement in order to have a common interest exception? That's my question. There's no cases that have been cited that say that. What's your position? What's my personal position? Your client's position. Because that does not need to be one. The court says that the purpose of the common interest exception is to allow attorneys to best represent the interests of their clients, to allow the free flow of information, and they say that the interest is an umbrella that's going to cover the attorneys and the clients, and whether or not there's an agreement in place I think would be irrelevant. Wouldn't prudence dictate that a lawyer be sure that his communications with a third party are privileged and protected so that the mere communication does not become exposed to the world? Isn't that part of what a lawyer is supposed to do to protect his client's privilege? It may be prudent, but in this instance we would still be in the same position we are right now because the railroad is saying even if we had a signed agreement, the common interest. Not signed. Any agreement. Forget signed. Okay. Any agreement? No. In other words, I'm going to talk to you, but we have to agree that it's not going to go beyond us. It's part of a joint privilege. Common interest privilege. Okay. Don't we have to agree to that? If we don't agree to that, then the attorney who is communicating I think runs the risk of destroying the privilege because he's communicated on an unprivileged basis. That's the difficulty. If a written agreement or an oral, any type of agreement is required, the word you used was prudent. I think it would be prudent. I don't think it's necessary, and I don't think it prohibits one from seeking to invoke the common interest exception. Okay. I think the heart of the good faith motion is addressed by the comments of the court in Clevelinga that says the rule is basically asserting the same arguments that are made in that case, that basically the parties need to agree on the apportionment or potential liability before a settlement can be reached, and that the non-settling parties should be able to sanction such a settlement to make sure that they're in agreement on their potential liability. The Clevelinga court says that that flies in the face of the public policy of favoring settlement, and what the railroad has asked the court to do here today is to encourage settlement by voiding this settlement and sending us back to litigate the case. The railroad has argued that the settlement discussions were done in secret and that they weren't invited, but they've provided no evidence or any, they haven't argued that they've approached the plaintiff regarding settlement. I think it's a disingenuous argument that had they been invited, this would have worked out better. So in summary, what we're asking is that the court find that this settlement between a satisfied patient and a doctor who has denied any negligence. Sorry, before you summarize, I do have one question. So if we reverse the good faith finding and the case goes to trial, what happens to the liens? There's some, and this is, I'm just trying to figure out logistically. So let's say there's $2 million and it's a million million. Do you pay your own liens? What happens to those liens below if you know? We don't know. That hasn't been discussed, but what we do know is that the liens exist, and they would exist whether they're held by a third party defendant or whether they're held. And even if you have liability, you could, your own liability could pay off those liens? How does that work? I'm just curious if you know. No, I don't know. My hope is that we won't have to find out. I understand. So. And what happens if we reverse the good faith settlement to your settlement with Mr. Ross? Does that stay in place? So one of the provisions within the settlement agreement is that the settlement agreement is contingent on a good faith finding by the court. So in summary, what we have is a satisfied patient, a doctor who has denied negligence, treating physicians who have supported the care he provided. He said that he has made an exceptional recovery. Our doctor said he's made an exceptional recovery. And we would ask that the court consider not only the railroad's argument about the potential liability, but all possibilities that there could be a verdict of zero, and Dr. Elias has now paid more than his fair share. We believe the settlement was reached in good faith. There's no evidence of fraud or collusion or any type of bad faith. None has been presented. The railroad has that burden by a preponderance of the evidence, and it has not been met. And we would ask that the court also uphold the circuit court's finding that a common interest existed between the plaintiff and the third-party defendant, and they were afforded to invoke the common interest exception to the waiver of attorney-client privilege. We would ask that this honorable court uphold both of the circuit court's previous rulings. That's it. Thank you. Thank you, Pat. Please, the court. A few points. First, Justice McPhee, you were correct in the Clairenda, the resolving $275,000, but the party who had the room there had paid in settlement over a million dollars, so it's a completely different situation. There was also a question about what they knew about Zellbee's opinion. Zellbee's affidavit was attached to the Med-Mal complaint, so under oath they knew all about his opinions. A couple of other points. The question, and you all practiced, the question about whether a confidentiality, whether an agreement on a common interest to share confidential information has to be, there has to be an agreement. It's obvious. There can't be any ambiguities about what's being agreed to or is it going to be disclosed to. In fact, the disclosing lawyer is at risk to make sure that what he tells the other lawyer will go no further. You just can't have loose ends in a joint defense agreement. And while it is true that in the Zellbee case there was a written agreement and the court never reached the question, I don't think, whether there had to be some agreement, or at least a law agreement, I would bet that six times or more in Judge Ellis's opinion, he says documents exchanged pursuant to an agreement. That pursuant to an agreement appears over and over in his opinion. But I wouldn't rely on that when I would say rely on your common sense. If there isn't anything out there, I would hope that after today there will be. And that will solve that problem. But you can't leave this loose end out there. One final point, this discussion of excellent care, let's see. Let's see what happens when it goes to the jury to decide if that was excellent care. I imagine when the plaintiff's expert, and he says here a positive point, the plaintiff's expert testified there are only 17 unnecessary treatments. And these 173 physical therapy treatments didn't hurt anybody. I don't think that that's the kind of testimony that's going to sway the jury. That's the best you can do. But he didn't hurt them any. That's not the standard of care that you usually hear. And Dr. Gates said, when Dr. Elias altered records, changed his records, after he saw Zellbee's report, that violated the standard of care. That was negligence. That violated the standard of care by doing that and not knowing in his records that they were changed at the least. Again, I would ask that you reverse and find that there is no good faith sentiment. Reverse and find that there is no common interest. And because there is no common interest and because there was no written agreement or the moral agreement, and reverse that portion of the case also. And I thank you for your attention and for extra time. Thank you all for an excellent briefing and argument on the concepts of interesting issues. And we will take this under advisement.